**B.S. INTERNATIONAL LIMITED**

v.

**Frank LICHT, as Executor of the Estate of Barry R. Newman and Trustee of the Trust created pursuant to the Last Will and Testament of Barry R. Newman; Morton B. Newman and Minnie Newman, as Co–Executors of the Estate of Barney Newman, and Vincent Pellegrini.**

Civ. A. No. 86–0025B.

United States District Court,
D. Rhode Island.

Oct. 12, 1988.

J. William Codinha, Fred A. Kelly, Peabody & Brown, Boston, Mass., Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, R.I., for plaintiff.

Raymond A. LaFazia, Guy J. Wells, Gunning, LaFazia & Gnys, Inc., Providence, R.I., for defendants Frank Licht, Morton B. Newman and Minnie Newman.

Matthew F. Madeiros, Edwards & Angell, Providence, R.I., for defendant Vincent Pellegrini.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiff, whose principal owner is Steven Baracsi, filed a ten count complaint against the Defendants alleging securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 against Frank Licht and Vincent Pellegrini; alleging securities fraud in violation of Section 12(2) of the Securities Exchange Act of 1933 against Frank Licht, Minnie Newman, and Morton B. Newman; alleging racketeering in violation of the Racketeer Influenced Corrupt Organization Act (RICO) against Frank Licht and Vincent Pellegrini; alleging negligent misrepresentation against Minnie Newman and Morton Newman; alleging fraud and misrepresentation against Frank Licht; and alleging breach of contract against Frank Licht, Minnie Newman, and Morton B. Newman. Vincent Pellegrini filed a counterclaim alleging that Plaintiff wrongfully withheld his pension in violation of the Employee Retirement Income Security Act of 1974 (ERISA) and in violation of the antidiscrimination provisions of the Lang Pension Plan. Neither Plaintiff nor Defendants requested a jury trial.

This matter was tried by the Court. The Court granted Defendants Licht's and Pellegrini's motions for a directed verdict on the RICO allegations.

This litigation arises out of the 1985 sale of Lang Jewelry Company (Lang) stock by executors of the Wills of two deceased stockholders and the sale of real estate held in a trust created by one of the deceased stockholders to the Plaintiff, B.S. International Limited (B.S.I.). In order to understand the transaction, a brief review of Lang's history is necessary.

Barney Newman founded Lang Jewelry Company in 1945. Lang, a Rhode Island corporation, manufactured finished jewelry products which were sold in interstate commerce. Lang would purchase materials, design the jewelry, and manufacture the jewelry. It had an oral consignment lease with Engelhard Corporation, whereby Lang would order gold from Engelhard and would pay Engelhard a monthly lease fee of 3½% of the value of gold held on Lang's premises. When Lang shipped the finished product which contained the gold, it would pay Engelhard the market value of the gold used in the product.

As a corporation, Lang issued 227.9 shares of no par common stock, which Barney Newman and his son, Barry R. Newman held. Although it is unclear how they held the stock while they were alive, the

disposition of the stock after their deaths is clear and important to this case.

By 1982, both Barney Newman and Barry R. Newman were deceased. Arnold Cutler, an attorney with the Boston law firm of Lourie & Cutler drafted Barney Newman's will. Minnie Newman, the wife of Barney Newman, and her son Morton B. Newman were named co-executors of Barney Newman's estate. Barney Newman's estate owned 152.9 shares or approximately 66.1% of the issued and outstanding stock of Lang. Minnie Newman and Morton B. Newman were elected to the Board of Directors of Lang in 1983. Neither Minnie Newman nor Morton Newman were officers or employees of Lang.

Frank Licht was appointed Executor of the Estate of Barry R. Newman and named Trustee of a Trust created pursuant to the Last Will and Testament of Barry R. Newman. The Estate of Barry R. Newman owned 75 shares or approximately 32.9% of the outstanding shares of Lang. The corpus of the trust consisted of the land and building where Lang was located, 250 Niantic Avenue, Providence, Rhode Island. Between the time of Barry R. Newman's death and the sale of Lang, Lang paid rent to the Trust.

After Barry R. Newman's death, the Board of Directors named Vincent Pellegrini to the presidency of Lang. Mr. Pellegrini had been an employee of Lang for 34 years. He began as office manager and was promoted to Vice President of Finance then eventually President, an office he held at the time of the sale of Lang. His duties required that he make the everyday business decisions. Mr. Pellegrini hoped to remain with Lang after the sale. During the "for sale" period, he played a major role in the sale of Lang by attending negotiation conferences, showing prospective buyers Lang's books, and accompanying prospective buyers on tours of the plant.

Lang had been profitable until the 1980's, but after the death of Barry R. Newman it began losing money. In late 1983, the Board of Directors, meeting at Frank Licht's office, decided to sell the operating assets of the company. At this time the real estate was not for sale. Licht sent a letter to Bernard Roth, Vice President of Financial Valuation and Advisory Services (FVAS) at the Rhode Island Hospital Trust Bank (RIHT), informing him of the Board of Directors' decision and requesting RIHT to prepare an Offering Memorandum along with locating potential buyers. Mr. Roth assigned his assistant, Robert Siwicki, an Assistant Vice President to supervise the project. FVAS became the exclusive selling agent of Lang's assets.

It is at this point that the waters begin to muddle. Plaintiff claimed that Minnie Newman and Morton B. Newman knew the Offering Memorandum prepared by Rhode Island Hospital Trust Bank contained misrepresentations and that the Offering Memorandum was being sent to potential buyers. Plaintiff also claimed that Pellegrini assisted in drafting the Offering Memorandum and recklessly made misstatements in the Offering Memorandum.

At trial, Plaintiff offered evidence that potential buyers, prior to B.S.I., were induced by the Offering Memorandum to purchase Lang. Potential buyers, however, discovered that Lang's assets were not as it claimed to be in the Offering Memorandum. The Court concluded that such evidence was not relevant to the case because it related to events a year prior to B.S.I.'s interest in Lang and because there was no relationship between other potential buyers and B.S.I.

Evidence of a November 1984 investigation by the loan department of RIHT, however, was admitted. Claire Roy, a field examiner of RIHT, conducted a survey of the books and records of Lang as part of a loan approval procedure because a potential purchaser sought a loan from the bank. Her survey was accomplished in three days time. She concluded that there were discrepancies in the inventory resulting in overevaluation. She discovered four problems with Lang's inventory: it was overstated based on purchase and sales ratios; the perpetual inventory system failed to accurately account for goods; there was a possible build up of slow moving or obsolete

inventory; and there was no certified inventory by an accounting firm. Miss Roy also reported that a considerable amount of the accounts payable was attributed to the precious metal consignment. The bottom line of Miss Roy's report recommended that before any consideration be given to the proposed $2,500,000 loan to a prospective purchaser a certified inventory should be completed. She noted, however, that even with a favorable certified inventory the loan should not in any event exceed $1,300,000.[1] Plaintiff contended that Frank Licht, Minnie Newman, Morton Newman, and Vincent Pellegrini committed fraud by not telling it about the evaluation and subsequent report.

In December 1984, Lang contacted the certified accounting firm of Midwood, Northrup & Associates (Midwood Northrup) to certify its inventory. Midwood Northrup certified the 1984 balance sheets of Lang, including the value of Lang's inventory as of December 31, 1984 which was valued at $2,173,000. This was the first certified inventory conducted at Lang. These certified balance sheets as well as uncertified financial documents were enclosed with the Offering Memorandum.

It is necessary to discuss Mr. Pellegrini's role in the December 1984 inventory since Plaintiff claimed that Mr. Pellegrini misrepresented the value of that inventory. Mr. Pellegrini testified that Lang conducted a physical inventory annually at the end of the calendar year. But, Mr. Pellegrini claimed that he was not involved with the inventory because he takes his vacation during that time. He, however, was familiar with Lang's standard procedures for conducting a physical inventory. Mr. Pellegrini had been Lang's Comptroller and Vice President of Financing.

Mr. Pellegrini stated that Michael Truppa, a comptroller for Lang, prepared a memo dated November 27, 1984 regarding the procedures to be followed for the physical inventory for December 1984. The memo stated that the items should be counted and labeled by item, description, and quantity. Then the items are classified as raw materials, supplies used in production, work-in-progress, finished goods, dormant goods, damaged goods, and inventory owned by others. Inventory that Lang had for more than six months was to be treated as dormant inventory regardless of whether it was raw material, work-in-progress or finished goods. Inventory owned by others but on the Lang premises was to be counted and listed separately. Inventory in this category included Engelhard precious metal and any other inventory or consignment from a vendor or customer except open line merchandise. A description of the item, quantity, and its owner was to be listed for each item. The memo detailed counting procedures to be used. In addition, the memo listed the supervisors and their respective areas of responsibilities.

Charles Horton, Lang's cost manager, was responsible for supervising the December 1984 inventory. According to Mr. Pellegrini, Mr. Horton was personally involved in evaluating dormant goods. Mr. Pellegrini testified that Lang usually did not assign value to the dormant goods, but that for the December 1984 inventory he asked Mr. Horton and Miss Gargano, Lang's assistant plant superintendent, "... to go through the entire inventory and determine what had any precious scrap value and so indicate." Mr. Pellegrini stated that he did not tell Mr. Horton to assign labor and materials values to the dormant goods. Mr. Horton, however, claimed that Mr. Pellegrini asked him to price the dormant goods at precious metal prices. Mr. Horton noted that doing so would result in higher values for the dormant goods than pricing them as scrap. Mr. Pellegrini denied this assertion.

In February 1985 Arnold Kilberg, a certified public accountant, acting as an agent for Steven Baracsi, the principal of B.S.I., contacted Robert Siwicki, at RIHT concerning purchasing Lang. Mr. Kilberg was Mr. Baracsi's financial advisor and acted with his authority. Mr. Siwicki sent Mr. Kilberg Lang's financial statements prepared by Midwood Northrup from 1979 through

---

1. Ultimately, the assets of Lang were purchased by the Plaintiff for $1,300,000, and $1,600,000 for the land and buildings where it did business, a total of $2,900,000.

1984, the December 1984 certified inventory, and the Offering Memorandum. Mr. Kilberg is a person with extensive experience in the jewelry industry and presumably thoroughly knowledgeable with all aspects of it. Providence is the location for many jewelry manufacturing firms and jewelry is a substantial part of the economy of the State of Rhode Island.

Mr. Baracsi was President of B.S.I. He emigrated from Hungary in 1956. Since his arrival in the United States, he has taken English courses at Brown University and at the University of Rhode Island. He appeared fluent in English while testifying. He became a United States citizen and eventually opened his own business, B.S. Trading Company, which imported costume jewelry. Mr. Baracsi's business duties included going overseas, purchasing goods, importing them into the United States, and selling the merchandise to manufacturers or wholesalers. Mr. Baracsi testified that he was not experienced with gold consignment until he purchased Lang. In addition, he noted that he was not an accountant, but was interested in Lang's inventory, accounts receivable, and accounts payable because that was what business meant to him. He impressed the Court as an astute and knowledgeable businessman and his denial of knowledge of gold consignments is incredulous.

There was testimony that Mr. Baracsi was interested in Lang for several reasons. One reason was that instead of just importing the goods, he could manufacture them himself. The other reason mentioned for Mr. Baracsi's interest in Lang involved Lang's tax losses. B.S.I. filed its tax return on the fiscal year ending October 31. After the sale, Lang became a subsidiary of B.S.I. and filed a short-period tax return through October 31, 1985. Thus, B.S.I. was able to receive some tax benefit from Lang's losses which offset B.S.I. earnings. A third reason for the purchase involved Mr. Baracsi's concern for the employees of Lang. He testified that if he purchased Lang and turned it around, then the employees of Lang would continue to have jobs.

Regardless of which reason one believes for Mr. Baracsi's interest in Lang, it is undisputed that he was interested in Lang. During the negotiations, Mr. Siwicki sent Mr. Kilberg updated financial statements (the first quarter statement and monthly internally generated financial statements through May 1985). Mr. Kilberg analyzed the first quarter statement for 1985 and discovered that the statement incorrectly stated that Lang had a net earning of $163,000. The first quarter statement indicated that Lang had a net earnings of "$163,000 CR." "Cr" is an accounting term which means a credit. However, when the liabilities were subtracted from income, it was apparent that Lang had a net loss. There was testimony by both Mr. Baracsi and Mr. Kilberg that they were aware that Lang lost money in the first quarter and expected that it would lose more throughout the year.

On June 7, 1985, Mr. Kilberg forwarded to Mr. Siwicki B.S.I.'s offer of $2,000,000 for the purchase of Lang's assets, excluding the real estate. In July 1985, as a part of the sales process, Mr. Baracsi and Mr. Kilberg were given a tour of Lang's operation and physical plant by Vincent Pellegrini. Mr. Baracsi testified that he was concerned about the inventory at the plant and felt that there was less inventory present than the records indicated. Mr. Baracsi claimed that Vincent Pellegrini told them that the entire contents of the vault, minus some boxes which belonged to the Newman family, were owned by Lang. Mr. Baracsi claimed that on another tour of the plant, he saw the Engelhard tag on precious metals and specifically asked Mr. Pellegrini if the gold in the vault belonged to Lang and that Mr. Pellegrini assured him that it did. Mr. Pellegrini denied that he told Mr. Baracsi that all the gold in the vault belonged to Lang.

In addition to touring the plant, Mr. Baracsi asked Mr. Kilberg to get a breakdown of the inventory reported in the December 31, 1984 balance sheet. Mr. Kilberg testified that Mr. Pellegrini gave him the following breakdown: approximately $406,000 was raw material which included precious and non-precious goods in the manufactur-

ing department, work-in-progress in the manufacturing department totalled $129,999, supplies such as pads, boxes, and plating totalled $120,000, dormant precious goods totalled $240,000, and finished goods totalled $916,000. Mr. Kilberg testified that he questioned Mr. Pellegrini about the totals and that Mr. Pellegrini explained that the totals were based on gold valued at $309 an ounce. Mr. Pellegrini stated that he relied on the December 1984 certified inventory to arrive at that breakdown.

In late July or early August 1985, Mr. Kilberg received Lang's July 31, 1985 internally generated financial statement. After reviewing Lang's financial data, Mr. Kilberg interpreted the financial data for Mr. Baracsi. Based on that information and the tour of the plant, Mr. Baracsi and Mr. Kilberg, acting as agents for B.S.I., participated in a negotiation session for the purchase of Lang's capital stock. The meeting was attended by Attorneys Frank Licht and Richard Canning who represented the Trust and Estate of Barry Newman, Attorneys Arnold Cutter and John Martin who represented Minnie and Morton Newman, B.S.I.'s attorney, Anthony Iannuccillo, Vincent Pellegrini, and Robert Siwicki. Neither Minnie nor Morton Newman were present. After Mr. Baracsi heard that Mr. Pellegrini expected Lang to lose $300,000 to $400,000 combined with Mr. Kilberg's analysis of Lang's financial records, Mr. Baracsi wished to change his offer to include the real estate. He offered $3,000,000 for both the stock and the real estate. Frank Licht mentioned that Lang could not be sold for less than $3,300,000. Mr. Baracsi and Mr. Kilberg retired to a separate room to consider their offer. They returned and offered $3,150,000 for the Lang stock and the real estate. Frank Licht accepted and an oral agreement was entered into by Steven Baracsi and Frank Licht. The allocation of the purchase price was $1,600,000 for the real estate and $1,550,000 for the stock.

Mr. Baracsi's concern about Lang's financial status and inventory continued even after he made a $100,000 deposit on the $3,150,000 offer. Mr. Baracsi was concerned about Lang's inventory. There was

testimony that during his second tour of the Lang plant, Mr. Baracsi asked Mr. Pellegrini the value of the inventory, and that Mr. Pellegrini replied that the melt-down value of the gold would be over $400,000. Mr. Pellegrini does not deny making such a statement, but contends it was an opinion based on the certified inventory for the year ending 1984, which noted that Lang had $481,136 worth of precious metals on hand. Although Mr. Kilberg could not remember if Mr. Pellegrini made the statement before or after the sale, Mr. Baracsi's testimony indicated that the statement was made prior to the sale.

Furthermore, Mr. Baracsi was concerned about the continuing growth of inventory as a result of low sales. The inventory was valued at $2,173,000 on the certified balance sheets of December 31, 1984. But by July 1985, the inventory value had increased to approximately $2.5 million. Mr. Kilberg testified that both Mr. Pellegrini and Attorney Licht assured him that the July 31, 1985 statement was correct and that he could rely on it.

In addition, Mr. Baracsi was concerned about Lang's accounts receivable. Mr. Kilberg concluded that the accounts receivable were greater than could be expected to be paid and that the reserve to cover bad debts was inadequate. There was testimony that Mr. Kilberg asked Mr. Pellegrini about the accounts receivable. Mr. Kilberg claimed that the ledger contained more than $100,000 of accounts that were more than a year old. Mr. Kilberg and Mr. Pellegrini agreed to establish a $25,000 reserve for uncollectibles or bad debts to help cover the possibility that certain accounts probably could not be collected. Although Lang had bad debts of $39,316 in 1983, Mr. Kilberg originally considered a $25,000 reserve for bad debts adequate for 1984. Mr. Kilberg, however, was concerned when he received the July 31, 1985 internally generated financial statements. He claimed that at the second meeting to negotiate the purchase of Lang, he again raised the issue that over $100,000 of the accounts receivable were dated prior to December 31, 1984 and expressed concern that a re-

serve of $25,000 was not sufficient. Mr. Kilberg testified that Mr. Pellegrini assured him that the reserve was adequate, that the accounts were collectible, that there were some posting errors which indicated that some paid accounts were shown as unpaid. Mr. Pellegrini denied that he made assurance to Mr. Kilberg and claimed that he never discussed posting errors with him. Furthermore, Mr. Pellegrini posited that he, even though he was president, had no role in determining bad debt or bad debt reserves. Mr. Pellegrini claimed that the credit manager, an individual who worked for Lang, determined if an account was uncollectable.

Sometime between the oral agreement to purchase Lang for $3,150,000 and the agreement being reduced to writing, Mr. Baracsi sought to lower the purchase price. No one was sure whether Mr. Baracsi and Attorney Licht negotiated the purchase price reduction in person or by phone. Regardless of where the negotiation happened, there is undisputed evidence that it occurred. However, there was a dispute as to why the price was reduced. Mr. Baracsi claimed that the price reduction resulted from his concern about Lang's inventory and accounts receivable. Mr. Kilberg stated that he thought the price was reduced because of Mr. Baracsi's concern about inventory and accounts receivable. Attorney Canning testified that the price was reduced by $250,000 in consideration of the removal of a clause from the purchase and sale agreement, which required an inventory to be taken the day before the closing. Attorney Canning stated that Mr. Baracsi was in a hurry to close the deal, so that he could gain tax advantages by terminating Lang's fiscal year. Mr. Siwicki substantiated Attorney Canning's assertion that the purchase price was reduced because Mr. Baracsi accepted all risk connected with the inventory and accounts receivable. Although the purchase price for the stock was reduced by $250,000, the purchase price for the real estate remained the same, $1,600,000. So the agreed purchase price for Lang totaled $2,900,000. The assets of the corporation were sold for $1,300,000, the same amount that Rhode Island Hospi-

tal Trust has suggested it would loan to acquire the assets.

On or about August 16, 1985, a binder agreement was signed by Frank Licht, as Executor and Trustee, and Steven Baracsi, as principal of B.S.I. Richard Canning, also, signed acknowledging that the $100,000 deposit would be held in escrow. Neither Minnie or Morton Newman were present.

On August 22, 1985, the purchase and sale agreement for the stock and the purchase and sale agreement for the real estate were executed between Steven Baracsi and Frank Licht. Neither Minnie nor Morton Newman were present. The closing date was set for September 5, 1985.

The stock purchase agreement dated August 22, 1985 stated the duties of both buyer and seller. Article 10 of the stock purchase agreement provided an indemnity clause.

10. Indemnification. Seller shall indemnify and hold harmless Company and Buyer, at all times after the closing of this Agreement, against and in respect of: (a) all liabilities of Company of any nature, whether accrued, absolute, contingent, or otherwise, existing at the date of closing, to the extent not reflected or reserved against in full in the balance sheet of Company of that date, including, without limitation, any tax liabilities to the extent not so reflected or reserved against, accrued in respect of, or measured by income of Company for any period prior thereto, or arising out of transactions entered into, or any state of facts existing, prior to such date; (b) all liabilities of, or claims against, Company arising out of the conduct of the business of Company between July 31, 1985 and the closing date otherwise than in the ordinary course of business or arising out of any presently existing contract or commitment of the character described in subparagraph (k) of Article 4 and not listed therein, or arising out of any contract or commitment entered into or made by Company between the date hereof and the closing date except as permitted by the provisions of subpara-

graph (e) of Article 6; (c) any damage or deficiency resulting from any misrepresentation, breach of warranty, or nonfulfillment of any agreement on the part of seller under this Agreement, or from any misrepresentation in or omission from any certificate or other instrument furnished or to be furnished to Buyer hereunder; and (d) all actions, suits, proceedings, demands, assessments, judgments, costs and expenses incident to any of the foregoing. Seller shall reimburse Company or Buyer, on demand, for any proper payment made by Company or Buyer at any time after the closing, in respect of any liability or claim to which the foregoing indemnity relates.

Buyer agrees in its capacity as stockholder of the Company to cause the Company to pay its liabilities as at the Closing, in the ordinary course of business.

It is a condition to Seller's obligation under this Article 10 that Buyer shall cause notice of any asserted liability under this Article 10 to be given to Seller within ten days after Buyer becomes aware of such asserted liability which would give rise to indemnification under this Article. Seller shall thereupon become entitled to assume the defense of the matter as provided in paragraph 12, provided that Buyer may also participate in such defense at his own expense.

During the period between the execution of the purchase and sale agreements and the closing, Mr. Baracsi wanted to make sure that Lang did not lose any inventory. He suggested to Mr. Pellegrini that scrap gold from the plating department should be stored in the vault and that security should be improved. Mr. Pellegrini purported to comply with Mr. Baracsi's wishes.

Mr. Baracsi hired William Harper before the closing to advise him on various matters. Mr. Baracsi claimed that Mr. Harper was hired to provide security such as: changing locks after the purchase, developing a security system in the building, and facilitating the entry for B.S.I. security people. Upon further questioning, Mr. Baracsi admitted that he hired a security agency from Cranston to provide around the clock security. There was testimony that Mr. Harper was sent to compile a list of job descriptions for Lang employees and to review inventory cards rather than provide security. Mr. Pellegrini testified that Mr. Baracsi introduced Mr. Harper to him as his personal confidant. Mr. Harper and his employee, Marilyn Millard, remained at Lang until the closing. Mr. Pellegrini stated that they had unrestricted access to all of Lang's records and to all of Lang's personnel, including those who dealt with the Engelhard gold consignment. Furthermore, he stated that Mr. Harper and Miss Millard copied two inventory books, one which even had the inventory recap sheets showing the leasing program of precious metals from Engelhard. Mr. Baracsi testified that he had no knowledge that Mr. Harper copied any of Lang's financial records. Mr. Harper, however, testified that he did copy Lang's financial records but that they were not used for anything.

There also was testimony that Mr. Harper knew about the Engelhard gold consignment. Robert Nicholson, a comptroller and office manager for Lang since February 1985, testified that he told Mr. Harper that all of the gold in the vault belonged to Engelhard and he thinks he specifically used the words consigned gold. In fact, Mr. Nicholson claimed that Mr. Harper watched a physical inventory of the Engelhard gold. The Engelhard gold was inventoried biweekly so that Lang's records of gold use and Engelhard's records of gold shipped could be reconciled.

In addition, Mr. Harper gathered personnel information. He asked Mr. Pellegrini to prepare a job description for office and supervisory personnel. Mr. Pellegrini issued a memo dated September 3, 1985 asking the personnel to cooperate and to complete the attached job description requests. Mr. Harper received the information and compiled a list of job descriptions for Mr. Baracsi.

At the end of August 1985, Mr. Kilberg also sent three of his employees to Lang to review its books and records. Mr. Pellegrini introduced them to Lang's Comptroller, who at that time was Mike Truppa, Lang's

bookkeeper, and other office personnel. Mr. Pellegrini stated that he told the Lang personnel to give these gentlemen access to whatever records they wanted. He also stated that while Mr. Kilberg's staff was at Lang, Lang personnel began an inventory at Mr. Baracsi's request.

During the preparation for the sale, Mr. Pellegrini was in a sensitive circumstance. He wanted to help the Estates and the Trust sell Lang but he also wanted to remain on good terms with the new buyer because he was hoping to continue his employment with Lang after the sale. Mr. Pellegrini claimed that Mr. Baracsi researched his background and asked him to stay on and run Lang for three years. Mr. Pellegrini states that he thought a three year commitment was too long because he didn't know Mr. Baracsi and Mr. Baracsi didn't know him. Mr. Pellegrini, however, felt that a one year agreement would be reasonable. Mr. Pellegrini's attorney drafted an employment agreement, providing for an increase in pay from $120,000 to $156,000 and a company furnished Mercedes Benz. Mr. Pellegrini gave the agreement to Mr. Baracsi in August. On the day before the closing, September 4, 1985, Mr. Baracsi informed Mr. Pellegrini that the terms of the employment agreement were not acceptable but he offered to retain Mr. Pellegrini at his then salary. Mr. Pellegrini refused and knew that the next day would be his last day at Lang.

Mr. Pellegrini, however, did not go without severance pay. In August 1982, after Barry Newman's death, Mr. Pellegrini was concerned about his employment at Lang. He negotiated with the Newmans a severance agreement in the event the company was sold or liquidated. He was to receive a three year severance of some kind and any company auto he had used. At the time of the sale he had a Cadillac. The entire Board of Directors agreed that he would be given $150,000 severance and two company automobiles.

But in August of 1985, when Mr. Pellegrini reminded Frank Licht about the severance agreement, Licht replied that they didn't get what Lang was worth, so he should not expect to get that kind of money. After negotiating with Frank Licht and the Newmans' attorneys, Mr. Pellegrini agreed to accept $110,000 and one company automobile. Mr. Pellegrini testified that he received the $110,000 and the car. B.S.I., however, was not told about the car and did not find out about it until after the closing.

The accounting of the transportation equipment is also a sticking point. The December 31, 1984 balance sheet indicated $92,102 in Property and Equipment, which was Lang's category for transportation equipment. The $92,102 figure for transportation equipment remained consistent from the December 31, 1984 balance sheet through the September 5, 1985 financial statements, even though three vehicles were sold. Morton Newman purchased for $500 a 1980 Cadillac from Lang on March 29, 1985. He, however, could not remember if he paid for it. Minnie Newman purchased for $200 a 1979 Cadillac from Lang in April 1985. And Vincent Pellegrini purchased for $750 a 1983 Buick from Lang in April 1985. Plaintiff, however, claimed that those purchases were not reflected on the balance sheet transportation equipment column. There was testimony that the $92,102 figure reflected the original purchase price of the equipment. Mr. Pellegrini testified that the sales of the cars to the Newmans and Pellegrini were recorded as loans receivable and credited to the transportation account. In any event, the accounting for transportation equipment is hardly of serious consequence in a multi-million dollar purchase, particularly without evidence of the market value of the equipment at the time of sale.

Besides asking Mr. Pellegrini's assistance to prepare job descriptions and increasing security at the plant, Mr. Baracsi asked Mr. Pellegrini not to pay bills of the company before the closing. There was testimony that Mr. Baracsi wanted Lang to have large debts so that B.S.I. could use them to offset gains of B.S.I. Mr. Pellegrini stated that he complied with Mr. Baracsi's wishes. In addition, Mr. Baracsi asked Mr. Pellegrini not to make any large purchases. Mr. Horton testified that Mr. Pel-

legrini told him to hold off buying gold to replace the gold Lang used.

The closing took place September 5, 1985 without any major glitches. All the parties who were present at the signing of the purchase and sale agreements were also present at the closing, plus Morton and Minnie Newman and two Newman nephews.

Attorney Canning testified that at the closing there was a discussion concerning the pension plan and whether it was overfunded and a discussion of a bill from Lourie & Cutler for legal services. He also stated that Frank Licht requested that B.S.I.'s attorney make sure that the Lourie & Cutler bill got paid. Mr. Baracsi, however, stated that the bill would not be paid at this time. Other than the above mentioned areas and a lengthy closing agenda, Attorney Canning stated that he did not recall anything of substance.

In the beginning of September 1985 after the closing, Mr. Baracsi met with representatives of Engelhard. James Moulter, the credit manager for Engelhard, Mr. Tierney, another employee of Engelhard, Mr. Horton, and Attorney John Martin met with Steven Baracsi at Baracsi's office. Mr. Moulter knew Lang was sold and wanted to clarify Engelhard's gold leasing program with the new owners. There was testimony that prior to the meeting Mr. Horton and Mr. Moulter agreed on the total of Lang's indebtedness to Engelhard. Mr. Moulter told Mr. Baracsi that Engelhard's attorneys were concerned about the large amount of money Lang owed Engelhard because there was no record that Lang would guarantee payment. Lang owed Engelhard over $300,000.

According to Mr. Moulter, Engelhard sent Lang an invoice for the amount of gold shipped to Lang and the price of the gold. Lang would pay a leasing fee of 3½% annually on the gold shipped to Lang. Engelhard would bill the leasing fee to Lang monthly for the average amount of Engelhard gold at the Lang plant. After Lang shipped the gold out as a finished product, Lang would notify Engelhard that a certain amount of gold had been used.

Lang would then owe Engelhard the value of the gold Lang used. Lang could pay for the gold or it could replace the gold with Lang's own gold. But either way Lang was indebted to Engelhard in an amount equal to the value of the gold Engelhard shipped to Lang.

Mr. Kilberg stated that Lang owed $202,-600 to Engelhard as of December 31, 1984. According to Lang's books that amount continued to grow during 1985. Lang received 169.4712 ounces of gold from Engelhard between January–August 1985. At the market rate of $300 + per ounce, Lang's indebtedness increased.

Mr. Baracsi testified that he was shocked to learn that Lang owed Engelhard over $300,000, even though he knew that the accounts payable ledger showed that Lang owed more than $700,000. He claimed he did not go over the accounts payable to find out who was owed what, but was aware that gold was expensive and probably would be the biggest part of the accounts payable. Mr. Pellegrini testified that the Engelhard gold consignment was not booked as an asset or a liability. When asked during the trial who made that determination, Mr. Pellegrini stated that Lang's accountants recommended that procedure. However, at his deposition, Mr. Pellegrini stated that he made that determination. Mr. Pellegrini explained that they had a choice of either including both the asset and liability or not including either the asset or liability. He stressed that it could not be one-sided that is that the Engelhard gold in Lang's possession could not be recorded without an offsetting liability, or that the transition would be treated as a "wash" with neither the gold value nor the debt reported. When asked how the amount of gold that went out the door of Lang would be recorded, Mr. Pellegrini stated that it would be booked as an accounts receivable, because some third party owed Lang for the cost of the finished goods. However, the amount Lang owed Engelhard was not booked as an accounts payable.

Mr. Baracsi assured Engelhard that he would pay Engelhard whatever Lang owed

it. Mr. Baracsi, however, claimed that even though he guaranteed payment he did not know that the money was owed for the gold consignment. It is not believable that an experienced businessman would guarantee payment for something that he claims he doesn't know anything about. In addition, Mr. Baracsi told Engelhard's representative, Mr. Moulter, that he was going to work with him as the previous owners of Lang had worked with Engelhard. Again it seems incredible that Mr. Baracsi would continue the relationship with Engelhard, if he did not initially know what Lang's relationship had been with Engelhard. It is also important to note that Mr. Baracsi did not report the Engelhard debt to Frank Licht, even though he said he was initially shocked by the debt. Furthermore, Mr. Baracsi stopped short of entering into a written arrangement with Engelhard, but stated that he would after he had a "managing" team at Lang. He also told Engelhard that it would have to deal with them.

Later in September 1985, Mr. Baracsi named Donald Leef to the management team. As Lang's executive vice president, Mr. Leef described his duties as including responsibility for all aspects of the business except sales and marketing. Once the management team was in place, Mr. Baracsi left for a Hong Kong trip in the beginning of October 1985.

While searching for records, Mr. Leef found a ledger called "Engelhard gold usage and buy down" in Mr. Pellegrini's former desk. The Engelhard gold usage and buy down ledger was the only record that indicated how much Engelhard gold Lang used. Mr. Leef compared it to Lang's computer printout on precious metals and discovered a discrepancy in the amount of gold bought and the amount that was shipped from Lang as a finished product. There was some testimony that Mr. Leef met with Mr. Moulter to discuss the Engelhard gold. However, it was unclear whether that meeting occurred before or after Mr. Baracsi returned from his Hong Kong trip which was in late October 1985.

After Mr. Baracsi returned from Hong Kong, Mr. Leef informed him about the Engelhard consignment and told him that all the gold in the plant did not belong to Lang. Mr. Baracsi claimed that he was very upset, but he did not contact Frank Licht.

Mr. Leef began preparing for the end of the tax year. While reviewing company ledgers and invoices, Mr. Leef observed that some bills were not recorded in accounts payable. Mr. Leef, however, did not learn about the indemnity provision, with its ten day limitation, in the stock purchase and sale agreement until the end of November 1985. On December 4, 1985, Mr. Leef sent Attorneys Cutler and Licht a letter detailing the undisclosed liabilities that he discovered.

The letter discussed that in early September 1985 Lang owed Engelhard 1,079 ounces of gold at $325 ounce and that some of that gold had been shipped to customers without Engelhard being advised. It further noted other bills which Plaintiff claimed were undisclosed liabilities:

| DATE OF INVOICE | FROM | PURPOSE | AMOUNT |
| --- | --- | --- | --- |
| 8/28/85 | Robert Half of Providence | Personnel agency services 2/19/85 | $2,258.28 |
| 9/16/85 | Lundwall Machine Company | Repairs completed in 3/1/85 | 3,130.76 |
| 9/19/85 | NCR Credit Corp. | Property taxes 1983 and 1984 | 2,420.86 |
| 10/3/77 | Lang to Carl Brauner | Supplement pension | 2,000.00 [2] 10 years or life |

2. This matter is presently being litigated in the Superior Court. Mr. Kilberg sent a letter dated 9/12/85 to Attorney Iannucillo requesting him to notify Licht & Semonoff that he recently found the 10/3/77 supplemental pension agreement and that it constituted an undisclosed liability.

| DATE OF INVOICE | FROM | PURPOSE | AMOUNT whichever is longer |
|---|---|---|---|
| 9/30/85 | IRS | Interest and penalty due tax period 6/30/85 | 831.68 |
| 7/23/85 | RIHT | Duplicate bill for period 4/1/85–6/29/85 for Pension Plan Investment Manager | 1,044.38 |
|  |  | Custodian Fee | 374.69 |
| 8/8/85 | RIHT | Edwards & Angell legal services rendered to RIHT on behalf of Lang 3/1/85–5/31/85 | 1,540.90 |
| 7/15/85 | American Greetings Corp. | Royalties owed dating back to 1983 | 4,316.00 |
| 9/4/85 | State of Rhode Island | Audit of dormant or unclaimed goods through 8/85 | 3,264.83 |
| undated | City of Providence | Personal property and motor vehicle taxes for 1984 | 6,215.35 |
| 8/16/85 | Midwood, Northrup & Associates | Professional services in preparing Pension Plan financial report for year ending 12/84 | 300.00 |
| 8/27/85 | Midwood, Northrup & Associates | Professional services rendered for six month ending 6/30/85 | 1,950.00 |
| 8/13/85 | Lourie & Cutler | Legal services rendered 9/15/83–4/30/85 and | 34,814.00 |
|  |  | 5/1/85–8/12/85 | 9,948.00 |
| 8/13/85 | Lourie & Cutler | Legal services rendered 1/14/83–8/12/85 for income tax deficiencies | 22,461.00 |
| 8/22/85 | Pension Service Consultants, Inc. | 1984 amendments | 1,000.00 |
| 9/30/85 | TNM, Lathrop | Repairs to Barry Newman's automobile | 1,244.74 |
| 9/3/85 | American Express | Vincent Pellegrini 1 Dinner Boston 1 Dinner Providence 1 Dinner New York New York Hotel | 469.53[3] |
|  |  | Minnie Newman annual membership fee for 10/85–9/86 | 40.00[4] |
|  |  | Morton Newman 2 airline tickets Boston–Ft. Lauderdale 1/1/86–return 1/5/86 | 886.00[5] |
| 10/16/85 | Shell Oil Co. | Gasoline | 109.33[6] |
| 10/5/84 | S.E. Nichols, Inc. |  | 1,060.50 |
| 10/15/85 | Mobil Oil |  | 141.81[7] |

3, 4, 5. Cancelled check from Lang is a full exhibit.

6. Cancelled check from Lang is a full exhibit. Mr. Leef claimed that the gasoline was purchased in Florida.

7. Mr. Leef claimed that $81.27 of the bill reflected repairs to V. Pellegrini's automobile on September 5–6, 1985.

Mr. Leef's letter continued on to a third page stating that he was advising Attorneys Cutler and Licht that those items may constitute a breach of warranty, misrepresentation, and non-fulfillment of the agreement by the seller. He also asked about the pool of transportation equipment valued at approximately $91,000 but which consisted at that time of only one car and one van on the company premises; about how to collect $20,000 that salesmen owed Lang but were not in Lang's employ in July 1985; about loans totaling $1,370 to V. Pellegrini, Morton and Minnie Newman; and about double billing in 1984 and 1985 to Avon and J.C. Penney for approximately $18,000. Mr. Leef also reiterated some concerns Mr. Kilberg had expressed before the closing, namely bad debts and the reserve for bad debts. He noted that there seemed to be a significant amount of accounts receivable that were known to be bad debts prior to July 1985 but were not listed as bad debts and that the reserve for bad debts seemed inadequate. Also, Mr. Leef noted that it appeared that finished goods were valued using a formula tied to the selling price rather than being valued at the lower of either cost or market, which Lang claimed to use as its method of inventory valuation. Furthermore, Mr. Leef expressed concern that gold and silver may have been valued higher than the market value. Lastly, Mr. Leef stated that containers of hazardous materials, some dating back more than five years, were discovered in the factory.

Mr. Leef spoke to Attorney Licht by phone and attempted to arrange a meeting with him. Unfortunately, one did not immediately materialize. Frank Licht, however, did meet with Mr. Pellegrini on December 12, 1985 and gave him a copy of Mr. Leef's letter dated December 4, 1985. Mr. Pellegrini stated that he thought the claims were spurious. He contended that he followed the usual customary practice to determine the amount of gold in the inventory. Furthermore, Mr. Pellegrini indicated that he was upset about receiving $40,000 less as severance than what had been agreed upon. He also indicated that

he was not prepared to spend any time on these matters unless he was compensated. Mr. Pellegrini denies that he was compensated for his time spent on litigating this matter and Plaintiff did not present evidence that he was compensated.

Mr. Leef later sent a letter dated December 27, 1985 to Attorneys Cutler and Licht. He noted that three additional items should be included on the list of undisclosed liabilities. He stated that $653.73 appears uncollectable in the accounts payable ledger, but does not state the basis for this figure. Mr. Leef claimed that approximately $7,902 of sick and vacation time due employees were not reflected in the company books. He also expressed concern about a $1,125 order of diamonds by Mr. Pellegrini that was not recorded in the company stock room. Lastly, Mr. Leef corrected an error in his prior letter, which claimed that the lease with NCR was not on the company books when in fact it was recorded on the company books, even though it was not listed as a lease on the first agreement between B.S.I. and Lang. Mr. Pellegrini claimed that it must have been an error. Attorney Canning stated that he asked Mr. Pellegrini to list all of Lang's leases on the agreement. He testified that he relied on Mr. Pellegrini's knowledge of Lang.

On January 3, 1986, the buyer and seller held a meeting to address B.S.I. concerns about undisclosed liabilities. Mr. Baracsi was represented by Attorneys William Codina, Fred Kelly, and Anthony Iannuccillo, as well as Arnold Kilberg, Donald Leef, and William Harper. The Newmans were represented by Attorneys Richard Canning, Frank Licht, John Martin, and Arnold Cutler. Nothing was resolved.

Three days later, January 6, 1986, Attorneys Licht and Canning met again with Vincent Pellegrini to discuss B.S.I.'s concerns regarding Lang's undisclosed liabilities. Later, Ralph Northrup joined the meeting. Attorney Licht's secretary, Gloria Colella, took notes of the meeting and then typed them. Although it did not become a full exhibit, witness Attorney Canning was permitted to read Frank Licht's

statements because Frank Licht was deceased at the time of trial. Frank Licht's statements reiterated Mr. Baracsi's concerns about the Engelhard lease program. Frank Licht asked Mr. Pellegrini to comment about gold being shipped to customers without Engelhard being notified, about the physical inventory of gold, and about the manner Engelhard gold was reflected in Lang's records. In addition, Frank Licht asked Ralph Norton about the automobiles and how the sales were reflected on the books. Mr. Pellegrini and Mr. Norton answered Frank Licht's questions and explained the inventory methods and record keeping at Lang.

There were no further discussions between Mr. Baracsi or his representatives and representatives for the seller. Approximately one month later, B.S.I. commenced this action.

Mr. Baracsi testified that during his ownership of Lang he terminated the pension fund because it was overfunded; thereby using some of that income to offset losses. Lang continued to lose money. Mr. Baracsi claimed that between September 5, 1985 and July 31, 1986, he put $90,000 a month into Lang. Even with Mr. Baracsi's assistance, Lang was still not operating in the black.

By July 1986, Mr. Baracsi decided he could no longer afford to operate Lang. He testified that he closed Lang in July 1986 due to its continued losses.

Currently pending before the Court are the following claims: a § 10(b) securities fraud claim against Licht, a § 10(b) securities fraud claim against Pellegrini, a § 12(2) securities fraud claim against Licht, a § 12(2) securities fraud claim against Minnie and Morton B. Newman, a common law fraud and misrepresentation claim against Licht, a negligent misrepresentation claim against Minnie and Morton Newman, a common law fraud and misrepresentation claim against Pellegrini, a breach of contract claim against Licht as Executor and Trustee of the Estate and against Minnie and Morton Newman as the co-executors, and, finally, Pellegrini's counterclaim that his pension was withheld in violation of ERISA and in violation of the anti-discrimination provisions of the Lang Pension Plan.

B.S.I.'s claim against Licht for 10(b) and 12(2) securities fraud and for common law fraud arise out of the same set of alleged facts, namely that Licht failed to disclose that Lang had a $318,825 gold lease program with Engelhard; that Lang did not have the $91,000 worth of transportation equipment represented in the financial statements; that Lang's bad debts were $50,000–$75,000 more than Lang's bad debt reserve of $25,000; that Lang's inventory was inflated and overvalued by $1.1 million to $1.3 million; and, that other material misrepresentations were made concerning Lang's financial condition.

B.S.I.'s claims against Pellegrini for 10(b) securities fraud and for common law fraud arise out of B.S.I.'s claims that Pellegrini was involved in and familiar with every major aspect of Lang's finances, and was aware of, supported, and endorsed the material misrepresentations contained in the written financial statements, and the oral representations made by Licht, Cutler, the Bank, and Midwood, Northrup & Associates. B.S.I. asserts that in order to assist with the sale of Lang Securities, Pellegrini, in addition to taking part in the above-listed misrepresentations, also made other misrepresentations to B.S.I. concerning the value of Lang's inventory, the nature and collectability of its accounts receivable, and the Engelhard gold lease.

B.S.I.'s claims for both the § 12(2) securities fraud and for negligent misrepresentation against the Newmans are based on actions taken on their behalf by Cutler, by Midwood, Northrup & Associates, and by Pellegrini. Specifically B.S.I. alleges that the Newmans failed to disclose to B.S.I. that Lang had a $318,825 gold lease program with Engelhard; that Lang did not have the $91,000 worth of transportation equipment represented in the financial statements; that Lang's bad debts were $50,000–$75,000 more than Lang's bad debt reserve of $25,000; that Lang's inventory was inflated and overvalued by $1.1 million to $1.3 million; and that other material

misrepresentations were made concerning Lang's financial situation. Further, B.S.I. claims that the Newmans were aware of or disregarded Lang's gold lease program with Engelhard, the overvaluation of Lang's inventory, and the other material misrepresentations that B.S.I. claims were made to it during negotiations.

B.S.I.'s claims against Licht and the Newmans for breach of contract are based on an alleged breach of warranties contained within the purchase and sale agreement regarding Lang's financial soundness. Specifically, B.S.I. asserts that by failing to disclose the existence of the Engelhard gold lease, by misrepresenting the value of Lang's inventory, and by failing to disclose other liabilities, deficiencies and omissions, Licht and the Newmans breached the warranties and representations made to B.S.I. in the purchase and sales agreement.

█ To prove a § 10(b) and a Rule 10(b)–5 violation of the Securities Fraud Act of 1934 as against a Defendant, Plaintiff must prove:

> that defendant engaged with scienter in conduct proscribed by § 10 and Rule 10(b)–5 by use of interstate commerce in connection with the purchase of Lang securities by B.S.I. which resulted in reliance by and damages to B.S.I.

Conduct proscribed by § 10 and by Rule 10(b)–5 of the Securities Act of 1934 includes the making of material misrepresentations or the omission of material facts with the intent to deceive, manipulate, or defraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).

█ To prove a § 12(2) violation of the Securities Fraud Act, the plaintiff must prove material misstatements or omissions in connection with the sale or offer for sale of a security. 15 U.S.C. § 77l(2). Proof of reliance by the purchaser is not necessary. However, a purchaser may not assert as a basis an inaccurate statement which he knows is not correct. *Cook v. Avien, Inc.,* 573 F.2d 685, 693 (1st Cir.1978); *see also Hill York Corp. v. American Int'l Franchisers, Inc.,* 448 F.2d 680, 695 (5th Cir.

1971). The burden shifts to the seller to show that "he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." 15 U.S.C. § 77l(2).

█ To prove common law fraud and misrepresentation as against a defendant, plaintiff must prove that that defendant intended to produce a false belief in plaintiff's mind with the intent that plaintiff would act upon such representation. *See International Shoe, Co. v. Berick,* 55 R.I. 333, 335, 181 A. 297 (1940); *see also Halpert v. Rosenthal,* 107 R.I. 406, 412, 267 A.2d 730, 734 (1970); *Home Loan and Investment Ass'n v. Paterra,* 105 R.I. 763, 768, 255 A.2d 165, 167–68 (1970).

█ To prove the breach of contract claim against a defendant, plaintiff must prove that that defendant, in violation of the warranties contained in the purchase and sales agreement, made misrepresentations or omissions of material facts. *See Handy v. Waldron,* 18 R.I. 567, 570, 29 A. 143 (1894).

There is a common theme running through all of plaintiff's claims against each defendant, that being the issue of whether a defendant made any misstatements, misrepresentations or omissions of fact to B.S.I. "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *see also R.H. Donnelly Corp. v. Illinois Bell Tel. Co.,* 595 F.Supp. 1202 (N.D.Ill.1984). Thus, the Court must decide whether a plaintiff has proved that a defendant made any misstatements, misrepresentations, or omissions of fact to B.S.I. This Court finds that plaintiff has failed to prove that any defendant made any misstatements, misrepresentations or omissions of fact to B.S.I.

█ This Court finds that neither Frank Licht, nor the Newmans, nor those who took action on behalf of the Newmans (i.e., Cutler, Pellegrini or Midwood, Northrup & Associates) failed to disclose or made any misstatements, misrepresentations or omis-

sions regarding the fact that Lang had a $318,825 gold lease program with Engelhard. Mr. Baracsi claims that he was not aware of the gold lease program. The Court finds this claim incredible for five reasons.

Firstly, Baracsi testified that he had seen Engelhard tags on the precious metals stored in the Lang vaults. At trial, he claimed that he had questioned Mr. Pellegrini about the tags and that Pellegrini had assured him that the gold belonged to Lang. Mr. Pellegrini testified at trial that he had not made any such statement. In view of the fact that Mr. Pellegrini had hoped and intended to work for Baracsi after the sale of Lang to B.S.I., it is not believable that he would lie to Baracsi about the ownership of the gold. To do so would only make his (Pellegrini's) position all the more precarious.

Secondly, Mr. Baracsi had been in the business of importing and selling goods to jewelry manufacturers for many years. He had substantial contact with the jewelry industry. His intimate knowledge of the jewelry business makes it unlikely that he was unfamiliar with common trade practices such as gold consignments.

Thirdly, some of Mr. Baracsi's own advisers testified that they were familiar with the Engelhard gold lease program. Arnold Kilberg, a Certified Public Accountant and both Baracsi's and B.S.I.'s authorized agent, testified that he worked extensively in the jewelry and that he was familiar with the industry custom of leasing precious metals. Baracsi's confidante, William Harper, stated at trial that he was told about the Engelhard gold lease plan by a Lang employee named Horton. Mr. Harper further testified that he had observed Lang employees taking a physical inventory of the Engelhard gold.

Fourthly, Mr. Baracsi testified that after the sale he had a conversation with an Engelhard representative named Moulter. Baracsi testified that he told Moulter that Lang, under B.S.I.'s ownership would continue to do business with Engelhard in the same manner as the prior ownership. Additionally, he guaranteed payment of any monies which Lang owed to Engelhard. Furthermore, although Mr. Baracsi testified that he was "shocked" at discovering the liability to Engelhard, he did not then protest to the sellers. He did not contact anyone to complain. That an experienced businessman would agree to do these things without any knowledge of what they entailed, or that having been "shocked" he would not have complained thereafter immediately is beyond belief.

The most compelling reason is the fact that Mr. Baracsi bargained for and got a $250,000 reduction in the purchase price in lieu of taking a physical inventory in September, 1985. Plaintiff not only would seek the benefit of what an inventory would disclose, but the benefit of his aggressive negotiation to reduce the purchase price based upon his willingness to proceed without one at a benefit to him of $250,000. B.S.I., through its principal Steven Baracsi, had knowledge of the Engelhard gold lease program before to the sale of Lang went forward in spite of it and now seeks to benefit from its willingness for a benefit to it of $250,000.

■ This Court finds that neither Frank Licht, nor the Newmans, nor those who took action on behalf of the Newmans (i.e., Cutler, Pellegrini, or Midwood, Northrup & Associates) failed to disclose or made misstatements, misrepresentations or omissions regarding the $91,000 worth of transportation equipment represented in Lang's financial statements as of December 31, 1984. There was no proof whether this figure was the original cost of the equipment less depreciation, its then value, or its cost. Depreciation was reported in a separate inventory category. It could well be that $91,000 represented the cost and that the various items had been depreciated fully. In any event, plaintiff failed to prove a misrepresentation or untruth. Lang's balance sheets and inventory as of December 31, 1984 were certified by Midwood, Northrup & Associates. Furthermore, B.S.I.'s own authorized agent Arnold Kilberg, a Certified Public Accountant, reviewed all of Lang's certified financial records and internally generated financial documents.

Based on Kilberg's recommendations, Baracsi sought to have the purchase price lowered. Given all of these factors, B.S.I.'s claim that misstatements, misrepresentations or omissions were made concerning the value of the transportation equipment must be rejected.

■ Neither Frank Licht, nor the Newmans, nor those who took action on behalf of the Newmans (i.e., Cutler, Pellegrini or Midwood, Northrup & Associates) failed to disclose or made misstatements, misrepresentations or omissions regarding the fact that Lang's bad debts were between $50,000 and $75,000 more than Lang's bad debt reserve of $25,000. This figure is but an estimate in any event. Plaintiff's own expert CPA thought it was too low. It was neither a misrepresentation nor an untruth. Mr. Baracsi's own testimony demonstrates that he knew of Lang's bad debts prior to the sale. He testified that he told Mr. Kilberg to negotiate a reserve for the debts. Mr. Kilberg and Mr. Pellegrini together agreed on a bad debt reserve of $25,000. Baracsi further testified that part of the reason for the reduction of the purchase price was because he was concerned about Lang's bad debts. Since Mr. Baracsi, B.S.I.'s principal, had extensive knowledge of Lang's bad debts prior to the sale and since the bad debts were used as a negotiating tool by Baracsi to reduce the purchase price, no misstatements, misrepresentations or omissions were made by any defendant as to the estimated amount of the bad debts.

■ Neither Frank Licht, nor the Newmans, nor those who took action on behalf of the Newmans (i.e., Cutler, Pellegrini or Midwood, Northrup & Associates) failed to disclose or made misstatements, misrepresentations or omissions regarding the value of Lang's inventory. Mr. Baracsi's testimony unequivocally proves that at the time of the sale he did not believe that the valuation of the inventory accurately reflected the actual value of the inventory. In fact, the formula by which B.S.I. calculated the purchase price for Lang was based on the actual value of the inventory being 25% of its stated value. Thus, for

each stated dollar of inventory, B.S.I. determined that there was only 25¢ of inventory. B.S.I. calculated the inventory value this way partly because of the fact that Baracsi had concerns about the inventory as a result of his initial tour of the Lang facility. Mr. Baracsi testified that the $250,000 reduction in the stock purchase price was due in part to his concerns regarding the value of the inventory. More credible, however, is the testimony of Attorney Canning and of Mr. Siwicki. Both of these witnesses testified that the purchase price was reduced by $250,000 in exchange for Mr. Baracsi's waiver of an inventory accounting. Thus, Mr. Baracsi himself assumed the risk for the value of the inventory being less than its book value. No misstatements, misrepresentations or omissions were made to B.S.I. by any defendant regarding the value of the inventory.

■ There was no failure to disclose or any misstatement, misrepresentation or omission by any defendant to B.S.I. of any other fact that would be of significance in the decision-making process of a reasonable investor. Further, with respect to plaintiff's claims under sec. 10(b) and Rule 10(b)–5 of the Securities Fraud Act of 1934 and common law fraud, Plaintiff has the burden to prove reliance upon a misstatement of material fact. There is no proof that Plaintiff relied on representations, now contended to be untrue. The proof which the Court accepts as true is exactly to the contrary. The evidence is that Mr. Baracsi knew of the Engelhard lease, his expert C.P.A. had more than sufficient information to make his own estimate of a bad debt reserve, knew of the method of inventory valuation, and did not know that the entry of $91,000 worth of transportation equipment was the then fair market value of the equipment or whether the equipment had been depreciated. Thus, Plaintiff has failed to prove reliance and its claims under Sec. 10(b)(5) and common law fraud must also fail. As is stated in *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 805 (1st Cir.1987): "[t]aken together, these factors can lead to but one conclu-

sion, that of the complete absence of justifiable reliance. No judge, no jury, in the faithful exercise of its factfinding duty, could come to any other decision. Justifiable reliance cannot be satisfied by this reckless conduct."

The "undisclosed liabilities" of roughly $101,850, outlined in Mr. Leef's letters of December 4 and 27, 1985 must now be addressed. There is no evidence that the challenged amounts are not included in gross figures in Lang's financial statements except for bills not then received. No breakdown of the accounts payable entries has been shown to indicate whether the amounts were included or omitted from the aggregate figure. There is evidence, however, that at the time of the closing certain debts had in fact been disclosed,[8] that certain bills had not been received until after the closing,[9] and that in any event Mr. Baracsi knew of the existence of accrued but unpaid debts. The evidence is that Mr. Kilberg's employees had spent a considerable period of time reviewing Lang's financial records. Mr. Kilberg is a sophisticated and experienced participant in this type of transaction. Also, Mr. Baracsi wanted Lang to have large debts in order to offset gains by B.S.I.

■ Whether or not Plaintiff has asserted a § 12(2) claim against the Defendants for these "undisclosed liabilities," any transaction involving capital stock sales is within the realm of transactions covered by the Securities Exchange Act. *See Occidental Life Ins. Co. of N.C. v. Pat Ryan's Assoc. Inc.*, 496 F.2d 1255, 1261 (4th Cir. 1974) (strong presumption that transaction covered). Unlike § 10(b) violations, which require scienter, liability under § 12(2) attaches for negligent as well as knowing omissions or untruths. 15 U.S.C. § 77l(2). The omission or untruth must be material, must be looked at in light of the circumstances under which it was made, and must be unknown to the purchaser. *See Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 802 (1st Cir.1987) (purchaser subject to inquiry notice where "sufficient storm warnings" would alert reasonable person). Further, if liability is found, relief is limited to return of consideration given, following the purchaser's tender of the purchased securities.

■ There is no evidence that the omission of these liabilities, if in fact any omission occurred, would be material, given the nature and size of this transaction. Neither is there evidence that the liabilities were unknown either actually or constructively to Mr. Baracsi when the omission was purportedly made. Moreover, Plaintiff here seeks money damages, not rescission as required by § 12(2), and has made no tender of the securities.

Lastly, Plaintiff's claims for common law fraud and breach of contract on this issue must also fail. No material misstatement or omission was made regarding these "undisclosed liabilities" upon which B.S.I. can be said to have reasonably relied. Mr. Kilberg's inspection of Lang's records, coupled with Mr. Baracsi's information about unpaid debts belie the common law requirement that the defrauded party not know or have access to knowledge about the truth of facts misstated or omitted. Nor do these alleged misstatements or omissions amount to a breach of contract or breach of warranties under the contract, again given the knowledge actually possessed by or imputed to Mr. Baracsi at the time the contract was executed.

Therefore, Judgment will be entered for Defendants for their costs.

The only issue left to be addressed is Mr. Pellegrini's counterclaim for pension benefits. No evidence was submitted at trial that would prove to what benefits, if any, Mr. Pellegrini is entitled. The counterclaim for pension benefits must be denied.

---

8. Attorney Canning testified that at the closing certain legal fees and pension fund liabilities of Lang were discussed.

9. Several invoices mentioned in Mr. Leef's letter of December 4, 1985 are dated after the date of closing.